Donnie JONES, Plaintiff,

v.

T.E. HUFF, W.J. Lasarso, and Arlo Baker, Defendants.

No. 82–CV–1031.

United States District Court, N.D. New York.

April 14, 1992.

Prisoners' Legal Services of New York
(John D. Charles, David C. Leven, of counsel), Albany, N.Y., for plaintiff.

Robert Abrams, Atty. Gen., David B. Roberts, Asst. Atty. Gen., Albany, N.Y., for defendants.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

On August 16, 17, and 18, 1989 and on October 23, 1989 this court at the United States Courthouses in Utica, New York and Auburn, New York presided over the non-jury trial in this case. The parties' post-trial memoranda were filed on April 25, 1990. This Memorandum–Decision constitutes the court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52.

In this case there is no question but that the plaintiff, Donnie Jones, suffered injuries because corrections officers beat him after he was insubordinate. Rather, the difficult questions in this case are whether defendant corrections officers Timothy Huff and William LaSarso engaged in gratuitous beating, or were present at the time that any unreasonable and excessive beating occurred and thus liable because they should have intervened to prevent such beating. In addition, there is some question as to whether the plaintiff sustained a fracture to the medial wall of his left eye as a result of his beating.

## I. APRIL 17, 1982: MOUNT McGREGOR CORRECTIONAL FACILITY, WILTON, NEW YORK

The plaintiff and the defendants agree on the events which commenced April 17, 1982, the date on which the plaintiff received injuries. On that day the plaintiff was incarcerated in the medium security unit of Mt. McGregor Correctional Facility ("Mt. McGregor"). On the morning of April 17, the plaintiff was involved in an altercation with other inmates as he was entering the prison mess hall. After breakfast the altercation resumed outside of plaintiff's dorm, B Dorm. A chase ensued and the plaintiff ran into and then back out of the dorm. Once outside, he picked up two rocks. He was stopped by a corrections officer before he could proceed further. In the melee, the plaintiff re-ceived a superficial cut. The nurse on duty at Mt. McGregor, Catherine Walsh, examined plaintiff in the prison infirmary and applied ointment to the cut. Trial Transcript ("Tr.") at 15–21.

While plaintiff was still in the infirmary, a sergeant questioned him regarding the other inmates involved in the altercation. The sergeant then escorted plaintiff to the A Dorm holding room where he showed plaintiff identification photos in an effort to obtain information from plaintiff regarding the other inmates involved in the altercation. After he identified an inmate from the photos, plaintiff was served lunch in the holding room. *Id.* at 21–22.

Following his lunch, plaintiff was escorted by defendant Corrections Officer William LaSarso to appear before a panel of the adjustment committee. The members of the panel were Nurse Walsh, defendant Corrections Officer Timothy Huff, and Lieutenant Richard Maxwell. Defendants' Exhibit ("Exh.") J, at 38. At the hearing, Lieutenant Maxwell brought up the fight and asked plaintiff to explain what happened. The adjustment committee listened to his explanation and then asked Officer LaSarso to escort plaintiff into the hallway while they made a decision. Tr. at 24, 446–47. Officer LaSarso brought plaintiff back into the hearing room, where Lieutenant Maxwell informed plaintiff that the matter would be referred to a Superintendent's proceeding, which is a disciplinary proceeding. The Lieutenant noted that plaintiff had bruises on his hands and asked plaintiff how he received them. Lieutenant Maxwell stated that he believed plaintiff had received the bruises during the fight. Tr. at 24; *see* Tr. at 293–94. Lieutenant Maxwell also informed plaintiff that he would be transferred to another facility. Tr. at 293, 447. Plaintiff got upset because he thought it was unjust that he would be punished for another inmate's conduct. Tr. at 25, 293, 448.

At the end of the adjustment committee meeting, Lieutenant Maxwell instructed Officers Huff and LaSarso to escort the plaintiff back to the dispensary so that Nurse Walsh could examine his hands and

the superficial scratch. Tr. at 25–26, 448. At the dispensary, plaintiff initially was uncooperative and refused to be examined. Tr. at 26; Deposition of Catherine Walsh ("Walsh Dep.") at 14. After one or both of the corrections officers warned plaintiff that to refuse the examination would only create more trouble, plaintiff relented and permitted Nurse Walsh to examine him. Tr. at 26, 295–96, 450.

Following the examination, Officer Huff informed plaintiff that he was to be placed in the A Dorm holding room. Tr. at 296. Huff and LaSarso escorted plaintiff out of the dispensary. A Dorm is located across from the doorway that led out of the dispensary. See Walsh Dep. at 21; Tr. at 296. Prior to leaving the building, plaintiff requested that he be permitted to return to B Dorm to collect his property. Officer Huff told plaintiff that he would not be permitted to go to B Dorm. Tr. at 296; see Tr. at 28.

Upon exiting the dispensary, plaintiff turned left and headed down the covered walkway[1] toward B Dorm, contrary to Officer Huff's directions. Tr. at 296. Officers Huff and LaSarso ordered the plaintiff to stop, Tr. at 297; see Tr. at 77, but the plaintiff continued walking away from the officers in a determined fashion toward B Dorm. Tr. at 78. Officer Huff caught up with the plaintiff, reached out and grabbed one of his arms to redirect him, Tr. at 298, 455, while Officer LaSarso placed himself between them and B Dorm. Tr. at 455. At that point plaintiff swung around and punched Officer Huff, hitting him in the shoulder. Tr. at 298; see Walsh Dep. at 72; Defendants' Exh. J, at 19. Officer Huff fell down, but continued struggling with the plaintiff. Tr. at 30, 298–99.

As Officer Huff and plaintiff struggled on the black top, Tr. at 30, Officer LaSarso approached and put plaintiff in a headlock on Officer LaSarso's right side. Tr. at 456; see Tr. at 32, 299. He punched plaintiff once in the right eye.[2] Tr. at 32. As he punched plaintiff, Officer LaSarso told plaintiff that he had just assaulted an officer. Tr. 31, 33. Officer Huff meanwhile placed a chicken wing hold on the plaintiff's right arm. Tr. at 300. Officers Huff and LaSarso then forced plaintiff to the A Dorm entry. Tr. at 398; see Tr. at 301. Another corrections officer, Officer Yearsley, opened the door to A Dorm for the three men. Id. Officer Yearsley also opened the door to the holding room. Id. Entering the holding room, LaSarso still had the headlock and Huff maintained the chicken wing hold on plaintiff's right arm. Tr. at 33, 301.

Defendants' Exhibit F, the A Dorm log book, contains the following entry:

1250 Officers Huff & LaSarso were escorting Inmate Jones back to Holding room when Jones swung at Huff. Both officers restrained inmate and put him in holding room. C.O. Yearsley hit Beeper for help—officers came[.] Inmate Jones would not strip frisk.

The court finds based on this entry that Huff, LaSarso, and the plaintiff entered A Dorm at 12:50 p.m.

Very soon after LaSarso, Huff, and the plaintiff entered the holding room, while the officers were attempting to get plaintiff onto the bed located opposite from the door, several corrections officers, including Officer Richard Warner, also entered the holding room. Tr. at 462–63; see Tr. at 303–06. Officer LaSarso released his headlock hold on the plaintiff, and Huff relaxed his hold on the plaintiff's arm. Tr. at 303. The plaintiff then hit or pushed Officer LaSarso, causing LaSarso to fall over the bed located opposite the door in the holding room. Tr. at 303, 464. Huff struggled to resume his restraining hold on the plaintiff's arm, and at the same time other officers assisted him. Tr. at 304, 436. One officer cleared inmates from the area. Tr. at 35, 306. As LaSarso got back on his feet, Officers Huff and Warner pushed

---

1. The corridor between the building housing the dispensary, and B Dorm is a covered walkway. See Tr. at 297. The walkway is made of blacktop. Id.; cf. Walsh Dep. at 92 (cement).

2. Officer LaSarso testified that he may have struck the plaintiff, but that he did not punch him. Tr. at 457. The court finds that he punched the plaintiff.

plaintiff onto the bed by pinning both of plaintiff's arms behind him. Tr. at 307; *see* Tr. at 37. Plaintiff was face down in the mattress. Tr. at 36, 86. He received kicks and punches once on the bed. Because he was face down, he could not see who was hitting him. Tr. at 37, 86.

The officers who were attacking plaintiff stopped and plaintiff received an order to take off his clothes. Tr. at 38. Plaintiff sat up on the bed and turned around. Tr. at 38. However, he apparently either refused to strip or was slow to act. *Id.; see* Defendants' Exh. F. As a consequence, several officers, including Officers Huff, LaSarso, and Warner, pulled and ripped the plaintiff's clothes off of him.[3] They forced him over on his stomach as handcuffs were brought in,[4] and plaintiff was then handcuffed, naked.[5] Tr. at 88. Officer LaSarso assisted with the handcuffing, and at one point caught one of his fingers in one of the cuffs. Tr. at 467.

With the cuffs in place, Officers LaSarso and Warner pulled the plaintiff to his feet and had him stand facing the wall. Tr. at 309; *see* Tr. at 40. The court credits plaintiff's testimony that, after they brought the plaintiff to his feet, Officers Warner and LaSarso punched, slapped and kicked him when he was standing naked facing the wall. Tr. at 40–41, 88, 90. After a period of time, a sergeant entered the holding room and the beating stopped. The sergeant told Officers Huff and LaSarso to leave the room and go see the nurse. Tr. at 42, 309, 471.

Officers Huff and LaSarso exited the room and went to see the nurse. Tr. 309–10, 471; *see* Walsh Dep. at 29. The sergeant also exited. Tr. at 42. After they left, the plaintiff was beaten further. Tr. at 42. Officer Warner kicked and hit the plaintiff at this time. Tr. at 42, 89–91. Indeed, plaintiff testified that Officer Warner attempted to kick plaintiff in the genitals as he stood, handcuffed, facing the wall. Tr. at 89–91.

It is this court's finding that Officer Warner was the corrections officer who struck plaintiff the most. *See* Tr. at 89–91, 142–43. A report prepared by the FBI on July 21, 1982, is particularly telling in this respect. The Special Agent who interviewed plaintiff after receiving a complaint letter from him reported the following:

> [The plaintiff] was punched in the face ... and someone hit him repeatedly. He indicated that the correctional officer who was hitting him repeatedly was leaving the position of correctional officer and was going to take a position in Texas approximately two weeks later.

Defendants' Exh. K. At trial, plaintiff identified Officer Warner as the corrections officer who was leaving for Texas. Tr. at 142. Despite the role played by Officer Warner throughout the extended beating of the plaintiff, the court finds that the injuries plaintiff suffered are, at least in part, a result of the beating inflicted on the plaintiff by Officer LaSarso and in Officer Huff's presence.

Officers Huff and LaSarso went to the infirmary as directed by the Sergeant who intervened briefly during the beating. They each were examined by Nurse Walsh. The nurse's reports give 1:10 p.m. as the time when she examined Officers Huff and LaSarso. Plaintiff's Exhs. 20, 21. The

---

**3.** This is corroborated (circumstantially) by the fact that, after the beating, Officer Huff went to the state shop to get plaintiff some new prison "greens" (clothes). Tr. at 310–11; *see* Tr. at 44–45.

**4.** It is unclear who provided the handcuffs. Officers Huff and LaSarso each testified that someone would have had to get them from the arsenal in the administration building. Tr. at 308, 466, 469. Officer LaSarso's testimony indicated that it took one to four minutes for the cuffs to arrive. Tr. at 466, 469.

**5.** Defendants contend that plaintiff was clothed when he was handcuffed. Tr. at 469; *see* Tr. at 307–309. It seems more likely, as plaintiff testified, that the clothes were removed from the plaintiff before he was handcuffed. *See also* Defendants' Exh. C at 2. If he was handcuffed while still clothed, the officers would have had to uncuff him, order him to strip, and then handcuff him again. The plaintiff's version seems more plausible because it is more streamlined, particularly in light of the log book entry which states that "Inmate Jones would not strip frisk." Defendants' Exh. F. The court therefore adopts plaintiff's version of this sequence of events.

court credits her reports as to the time the officers were examined. The nurse found that Officer LaSarso's right hand was reddened and sore in the fingers, wrist, and lower part of the hand, and that he had a reddened sore area around his left upper arm, back and neck. Plaintiff's Exh. 20. She recorded in her report that Officer LaSarso told her that he twisted his right hand and right knuckles when an inmate attacked him. *Id.* Examining Officer Huff, Nurse Walsh found that he had reddened sore knuckles and hands. Plaintiff's Exh. 21. He told her that both hands were reddened and sore from trying to subdue the inmate. Additionally, he reported trauma to his left shoulder; Nurse Walsh determined that there was some soreness present. *Id.*

After the examinations, Officer Huff returned immediately to A Dorm. Tr. at 403. He arrived just before Officer LaSarso, who escorted Nurse Walsh to A Dorm. Tr. at 403, 472. According to the A Dorm log book, the nurse arrived at 1:15 p.m. Defendants' Exh. F. Upon Officer Huff's return to the holding room, a sergeant, Sergeant Duggan, ordered him to go to the state store to pick up a new set of prison greens for the plaintiff. Tr. at 310–11. He left A Dorm on that errand. Tr. at 311.

At approximately 1:20 p.m. Nurse Walsh examined plaintiff in the holding room. Defendants' Exh. J, at 21, 22. She examined him while he was stripped. Nurse Walsh's examination revealed that plaintiff had some superficial bruises and the areas around both eyes were swollen. Walsh Dep. at 30. In addition, she identified lacerations on the right wrist and a small laceration on the left lower leg. Defendants' Exh. J., at 22.

Soon after the nurse completed her examination another corrections officer arrived in the holding room. He took two polaroid pictures of the plaintiff. Tr. at 46, 92; *see* Plaintiff's Exhs. 2, 3. These show the plaintiff: both cheeks are puffy, the left one especially so. His left eye is nearly swollen shut. There appears to be some blood, the end or remnant of a small flow, below the left nostril. The photos show the plaintiff without a shirt.

As the photos were being taken, Officer Huff returned with clothes for the plaintiff. Tr. at 46. The handcuffs were removed and plaintiff dressed himself. *Id.* at 46, 92. Once dressed, plaintiff was placed in handcuffs, leg irons, and a belly chain. *Id.* at 47, 92. Officer Warner and another officer then escorted plaintiff to the administration room where he waited to be transferred to Clinton Correctional Facility ("Clinton") in Dannemora, New York. *Id.*

The plaintiff testified that Officer Warner burned him with a cigarette once they were in the administration building. Tr. at 47. The court does not credit this testimony.[6] Nor does the court credit plaintiff's testimony that Officer Warner directed plaintiff to do a jig. *Id.* at 48.

Both the plaintiff and Officer LaSarso agree, and the court so finds, that while plaintiff was awaiting transfer in the administration building Officer LaSarso served plaintiff with a Notice of Report.[7] Tr. at 48, 474. The court also finds that Officer LaSarso instructed the plaintiff that when he got to Clinton he had better say that he swung at an officer and that he fell and hit his face. Tr. at 50.

## II. APRIL 17, 1982: AFTER PLAINTIFF LEFT MOUNT McGREGOR

The plaintiff was transported by van to Clinton Correctional Facility.[8] He arrived at the Clinton facility at approximately 6:30 p.m. Tr. at 180; Plaintiff's Exh. 23, at 7. He was met by defendant Sergeant Arlo Baker, a corrections officer at Clinton. Tr.

---

6. Even if plaintiff's testimony on this score were to be credited, he did not indicate that any named defendant had an opportunity to prevent Officer Warner from burning him with a cigarette. Hence, the incident is not compensable in this lawsuit.

7. The court does not credit plaintiff's testimony that Officer LaSarso spit at him and slapped him in the face with the Notice of Report. *See* Tr. at 48.

8. Plaintiff testified that one of the officers in the van threatened him. Tr. at 50. The court does not credit this testimony.

**532**

at 51, 180–81. Other corrections officers took pictures of the plaintiff at this time. Tr. at 52, 181–82; *see* Plaintiff's Exhs. 4–9. In the photos taken at Clinton, the court notes that the swelling around plaintiff's eyes is much more pronounced than in the earlier photographs at McGregor. *Compare* Plaintiff's Exhs. 4–9 *with* Plaintiff's Exhs. 2–3.

Sergeant Baker commenced to interview the plaintiff. Tr. at 182. Plaintiff testified that during the interview he started to tell Sergeant Baker that "C.O.'s jumped on [him]" but that Sergeant Baker, who was sitting at a table, stopped him short by pounding his fist on the table. Plaintiff then told Sergeant Baker that he swung at an officer and fell on his face. Tr. at 52. The court credits plaintiff's testimony on this sequence of events. As Sergeant Baker was interviewing the plaintiff he took notes. Tr. at 183.

After the interview Sergeant Baker escorted plaintiff to the dispensary. Tr. at 54, 184. Plaintiff was carrying two property bags at the time, each weighing approximately 25 pounds. The court credits plaintiff's testimony that Sergeant Baker, on the way to the dispensary, kicked him twice in the buttocks and told him he was moving too slowly. Tr. at 55, 111.

Once at the dispensary, plaintiff was examined by Nurse Thomas Flynn. Tr. at 184. Nurse Flynn identified swelling around both of plaintiff's eyes, scant bleeding from his left nostril, small cuts on the inner cheeks, swelling in the pinna, or outside area of both ears but particularly the left ear, two small cuts on the right wrist, an abrasion on the right side of the plaintiff's chin, a 5 cm contusion on the mid right shin, 2 small abrasions on plaintiff's left inner thigh, and a 3 cm contusion on the left shoulder. Plaintiff's Exh. 23, at 11.

After the examination at the Clinton dispensary, the plaintiff was taken to Champlain Valley Physicians Hospital ("CVPH")

in Plattsburgh, New York, were he was admitted.[9] At CVPH he was first seen by a Dr. Gulati. Portions of the doctor's report indicate, in relevant part:

*Chief Complaint:*

This patient no doubt told in front of the guards to me that he fell[.] [A]ll in strict confidence he told me that he was hit by fellows in the groins and in the forehead with fists and with sticks and this is what he tells me in strict confidence. . . .

*Physical Exam:*

Forehead is swollen.

Eyes: both are shut with hemorrhages. It is difficult to tell whether he can see well or not because of so much edema around the eyes. There is redness and swelling of the face especially the orbit areas. The patient can talk but he seems to have been scared and he just does not move, does not do very much at all.

.    .    .    .    .

Abdomen is soft but is tender in the left side and he has 2+ blood in urine so we will do at least an IVP because one can never rule out injury to the kidneys or to the spleen in such a situation when the patient has been hit.

.    .    .    .    .

Extremities: The patient has bruises in both groins also where he says he has been kicked. . . .

Plaintiff's Exh. 11, at 5. Dr. Gulati's report also mentions that the plaintiff was fully alert and awake during the examination. *Id.* The court finds Dr. Gulati's report to be credible.[10]

On the day following plaintiff's admission to CVPH, Sergeant Baker visited plaintiff in his hospital room. Tr. at 193. Sergeant Baker had transcribed his notes of the intake interview the previous evening and asked plaintiff to sign the notes as plaintiff's statement. *Id.* The plaintiff agreed to sign, and did in fact sign the statement. Plaintiff testified that he

---

**9.** Plaintiff testified that Sergeant Baker left him standing in the rain before leaving for the hospital. Tr. at 56. The court does not credit this testimony.

**10.** Plaintiff testified that he told Doctor Gulati that he was beaten up by corrections officers. Tr. at 146. The court credits this testimony.

signed the statement because he was fearful. Tr. at 58, 165. He did not read it. Tr. at 58, 133–34, 193. However, Sergeant Baker had previously told him that the statement said that he received his injuries from falling on the sidewalk at Mt. McGregor. Tr. at 58. The court finds that the signed statement is incorrect insofar as it states that plaintiff received his injuries when he fell on the sidewalk at Mt. McGregor. *See* Defendants' Exh. C, at 2.

### III. WHETHER PLAINTIFF SUFFERED A FRACTURE

Much of the trial focused on whether plaintiff sustained a "blowout" fracture to the medial wall of his left eye during his beating. While the question is a close one, there is support in the record for finding that plaintiff suffered such a fracture.

First, Dr. Gulati requested that tomograms, special x-rays for thin bony structures, be taken of plaintiff on April 19, 1982 for "a possible blowout fracture." Plaintiff's Exh. 11, at 34. Dr. DeLise, the radiologist who read plaintiff's tomograms, reported on April 20, 1982 that "[t]he findings are consistent with a fracture of the medial wall of the left orbit, with adjacent haziness and soft tissue changes in the left ethmoidal sinus." *Id.* At his deposition, the doctor opined that, given the circumstances of trauma to the plaintiff's head, his choice to use the words "consistent with" in the report was "a strong affirmative statement for a fracture." Deposition of Charles DeLise, M.D., at 8–9. Second, Dr. Alan Green, plaintiff's expert, testified that usually a blowout fracture is accompanied by a slight nose bleed. Tr. at 267. There is evidence in the record that the plaintiff sustained a slight nose bleed as a result of the beating administered to him. As noted above, Nurse Flynn found traces of bleeding from the left nostril, Plaintiff's Exh. 23, at 11, and the photographs taken

at McGregor immediately after the incident seem to show blood coming from the plaintiff's left nostril. Plaintiff's Exhs. 2, 3. Thus, after careful consideration of the issue, the court finds that plaintiff did suffer a blowout fracture as a result of his beating.[11]

When plaintiff was released from CVPH ten days after being admitted, a discharge summary was prepared. Plaintiff's Exh. 11, at 2, 4. As defendants point out, the discharge summary does not state that the plaintiff suffered a blowout fracture. However, the court finds it likely that several words were inadvertently omitted by the doctor who prepared the summary. The summary states, in relevant part:

> E[l]ectrolytes are okay and tomograms of the orbit were done, and the findings were consistent with a medial wall of the left orbit, with some hazziness [sic] and soft tissue changes in the left ethmoidal sinuses.

Plaintiff's Exh. 11, at 4. The above sentence would make more sense if it included the words, "fracture of the," as follows: "the findings were consistent with a [fracture of the] medial wall of the left orbit...." Particularly in light of the report of Dr. DeLise, who read plaintiff's tomograms and recorded that "[t]he findings are consistent with a *fracture of the* medial wall of the left orbit,"[12] the court finds that Dr. Gulati, who prepared the summary, inadvertently omitted those three words. Nevertheless, based on Dr. Gulati's examination, Plaintiff's Exh. 11, at 11 and reverse of 11, and his decision that because the plaintiff was not experiencing vision problems probably no treatment was required, Plaintiff's Exh. 11 at 4, the court finds that the blowout fracture plaintiff suffered was not severe.[13]

### IV. LIABILITY OF THE DEFENDANTS

█ The Eighth Amendment is the primary source of protection against exces-

---

**11.** In so holding, the court also finds that the fracture did *not* result from the initial headlock that Officer LaSarso placed on the plaintiff nor from the smoking pipe in Officer LaSarso's jacket pocket. Tr. at 512–13.

**12.** Plaintiff's Exh. 11, at 34 (emphasis added).

**13.** The court does, however, credit plaintiff's testimony that he now has sinus problems and throbbing headaches in certain circumstances that he did not have before the beating. Tr. at 62–63.

sive force for incarcerated convicts, of which the plaintiff is one. *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989), *quoting Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986); *Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989). To make a determination of liability on plaintiff's Eighth Amendment claims of excessive force in this case, the court must consider:

> the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *accord Hudson v. McMillian,* — U.S. —, —, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085.

■ The plaintiff asks this court to look only at whether unnecessary and wanton pain was inflicted on him. Plaintiff's Post–Trial Brief at 17. Apparently, plaintiff seeks to have the court apply a standard more akin to the deliberate indifference standard set forth in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The court declines to do so. The "deliberate indifference" standard articulated in *Estelle* was designed to address the state's obligation to attend to the medical needs of inmates, not the use of force such as that which occurred in this case. *See, e.g., Al–Jundi v. Mancusi,* 926 F.2d 235, 239 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 182, 116 L.Ed.2d 143 (1991). As the Supreme Court has held,

> '[D]eliberate indifference to a prisoner's serious medical illness or injury' ... can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates. But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison

officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against who force might be used.

*Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084–85 (citation omitted). In its most recent decision on this issue the Supreme Court identifies the concerns relevant in a prison riot situation, as in *Whitley,* with the concerns relevant in a lesser disruption such as occurred in *Hudson v. McMillian,* where an argument between a guard and an inmate resulted in two guards beating the handcuffed and shackled inmate as a supervisor watched. The Court noted that in both situations, "corrections officers must balance the 'need to maintain or restore discipline' through force against the risk of injury to inmates." Prison officials must act quickly and decisively in both situations, and they must be accorded deference in the policies and practices they determine are " 'needed to preserve internal order and discipline and to maintain institutional security.' " *Hudson,* — U.S. at —, 112 S.Ct. at 999 (quoting *Whitley,* 475 U.S. at 321–22, 106 S.Ct. at 1085–86). Thus, the Court held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

To make such a determination, the *Hudson* Court set forth various principles from *Whitley* for guidance. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.' ... In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship

between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, —— U.S. at ——, 112 S.Ct. at 999 (quoting *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085). The *Hudson* Court stressed that significant injury is not required to find the use of excessive physical force violative of the Eighth Amendment. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.; but see id.* —— U.S. at —— – ——, 112 S.Ct. at 1006–10 (Thomas, J., dissenting). The Court hastened to add, however, that not every malevolent touch by a prison guard is actionable. "The Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* —— U.S. at ——, 112 S.Ct. at 1000 (majority opinion) (quoting *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088); *see also Johnson v. Glick*, 481 F.2d at 1033. The Supreme Court determined that the blows Hudson received from the defendant prison guards causing bruises, swelling, loosened teeth, and a cracked dental plate, were not *de minimis* for Eighth Amendment purposes and therefore did constitute an actionable § 1983 claim. *Hudson*, —— U.S. at —— – ——, 112 S.Ct. at 1000–02.

This court is faced with a situation similar to the one presented in *Hudson*. Analyzing plaintiff's claims using the guidelines set forth in *Hudson* and those established by the Second Circuit in *Johnson v. Glick*, the court rules that each of the three defendants is liable to plaintiff in some degree for the wanton and unnecessary infliction of harm on April 17, 1982.

The court concludes that the initial physical encounter between plaintiff and Officers Huff and LaSarso in the covered walk-way outside the dispensary did not violate plaintiff's Eighth Amendment rights. Officer LaSarso's punch to plaintiff was administered in an effort to restore discipline in the face of plaintiff's deliberate disobedience in ignoring a repeated order to stop walking, and in subsequently striking Officer Huff. *See Ramos v. Hicks*, 1988 WL 80176 (S.D.N.Y. July 25, 1988) ("bent wrist comealong hold" or single punch not unreasonable or excessive where inmate ignored repeated order, became agitated, and attempted to damage state property). Similarly, Officer LaSarso's headlock on plaintiff as he escorted plaintiff to the holding room in A Dorm did not violate the Eighth Amendment because plaintiff continued to struggle as the officer attempted to gain control.

A corrections officer bears an affirmative duty to intercede on behalf of an inmate when the officer witnesses other officers maliciously beating that inmate in violation of the inmate's Eighth Amendment rights. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988); *Rascon v. Hardiman*, 803 F.2d 269, 276 (7th Cir.1986); *Putman v. Gerloff*, 639 F.2d 415, 423–24 (8th Cir.1981); *cf. Morales v. New York State Dept. of Corrections*, 842 F.2d 27, 30 (2d Cir.1988) (inmate-plaintiff stated a civil rights cause of action by alleging that a guard stood and watched while another inmate assaulted him). The duty arises if the officer has a reasonable opportunity to intercede. *O'Neill*, 839 F.2d at 11–12 (police officer can be held liable for "deliberately choosing not to make a reasonable attempt to stop" another officer from dragging a handcuffed arrestee across the room by his throat after having struck him three times for an accusatory remark).

By the time Officer LaSarso regained his feet after plaintiff caused him to tumble over the bed in the holding room, plaintiff was face down on the bed, pinned by Officers Huff and Warner. At the same time plaintiff was being kicked and punched by officers whom he could not see.

Those kicks and punches were not administered in a good faith effort to restore discipline, nor could they have plausibly been thought necessary since plaintiff was already pinned face down by two officers. Officer LaSarso did not intercede to stop the unnecessary beating and is liable to plaintiff for that failure.

■ Further, the court holds that Officer LaSarso violated the plaintiff's Eighth Amendment rights when he participated in ripping the plaintiff's clothes off of him because plaintiff would not (or was too slow to) strip. Such force was not necessary given the number of officers present in the holding room and the fact that by that point plaintiff was subdued. The court concludes that the stripping of plaintiff was done maliciously with the intent to humiliate him. In addition, Officer LaSarso flagrantly violated plaintiff's Eighth Amendment rights when he slapped and punched plaintiff as plaintiff stood handcuffed and naked. By that time, it was clear that the plaintiff was no longer misbehaving. The court concludes that this punching and slapping was vindictive and malicious.

■ With regard to Officer Huff, the court concludes that he also violated the plaintiff's Eighth Amendment rights. However, his conduct was not as egregious as Officer LaSarso's. Officer Huff's initial attempt to stop plaintiff from proceeding to B Dorm, and his chicken wing hold on plaintiff's arm while escorting him to the holding room in A Dorm were appropriate under the circumstances. His efforts to subdue plaintiff inside the holding room by forcing him face down on the bed were necessary to restore order and discipline after plaintiff caused Officer LaSarso to tumble over the bed. Although plaintiff was beaten as Officer Huff pinned plaintiff face down on the bed, the court is unable to conclude that Officer Huff had a reasonable opportunity to intercede on plaintiff's

behalf to prevent the kicking and punching. At the time, Officer Huff was trying to subdue the plaintiff. He cannot at the same moment be charged with the duty to subdue his colleagues.

■ The court concludes that Officer Huff did violate plaintiff's Eighth Amendment rights when he participated in tearing plaintiff's clothes off, for the same reasons as enumerated above with respect to Officer LaSarso. Furthermore, although the record does not indicate that Officer Huff participated in beating plaintiff after plaintiff was handcuffed, as set forth above with respect to Officer LaSarso, Officer Huff also bore an affirmative duty to intercede on plaintiff's behalf when he witnessed other officers maliciously beating the handcuffed plaintiff in violation of plaintiff's Eighth Amendment rights. The court holds that Officer Huff had a reasonable opportunity to intercede before he left for the dispensary, yet he failed to act to stop the beating. Officer Huff's failure in this regard constitutes a violation of plaintiff's Eighth Amendment rights.[14]

■ Finally, the court concludes that Sergeant Baker's kicks to the plaintiff's buttocks violated his Eighth Amendment rights. Given the injuries to plaintiff's head and eyes which were evident to Sergeant Baker, see Plaintiff's Exhs. 4–7, and given the fact that in each hand plaintiff was carrying a bag weighing approximately 25 pounds, the kicks were unwarranted and cavalier. The court acknowledges that the kicks did not cause plaintiff much physical pain. However, the extent of pain is but one element of the *Johnson* analysis. *Corselli v. Coughlin*, 842 F.2d 23, 26 (2d Cir.1988); see *Hudson*, ── U.S. ──── ────, 112 S.Ct. at 998–1002. The court concludes that, under the circumstances of this case, the kicks administered by Ser-

14. Once Officers Huff and LaSarso left the holding room on the sergeant's orders to go see the nurse, they no longer had a reasonable opportunity to intercede on plaintiff's behalf. On the one hand, to the extent that plaintiff was beaten after the defendant officers left the holding room they cannot be held liable for violations of plaintiff's Eighth Amendment rights. On the other hand, the court concludes that the beating administered by Officer LaSarso and in Officer Huff's presence partially caused the injuries plaintiff suffered.

geant Baker were unreasonable and excessive.[15]

## V. DAMAGES

In view of the above findings and conclusions, an award of damages to plaintiff is appropriate to compensate for his pain and suffering at the time and for the lasting effects he suffers including sinus problems and headaches behind his left eye. Given the court's finding that Officer Warner—who is not named as a defendant—inflicted most of the plaintiff's injuries, and given the finding that Officer Huff did not strike the plaintiff during the beating in the holding room, the court will apportion the compensatory damages between the defendants according to their respective portions of liability. *O'Neill,* 839 F.2d at 12. As against Officer LaSarso, the court awards the plaintiff $6,000 dollars in compensatory damages. As against Officer Huff, the court awards the plaintiff $3,000 dollars in compensatory damages. As against Sergeant Baker, the court awards the plaintiff $500 dollars in compensatory damages.

The court further concludes that punitive damages should be awarded in this case. *Smith v. Wade,* 461 U.S. 30, 51–56, 103 S.Ct. 1625, 1637–40, 75 L.Ed.2d 632 (1983); *see Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *Ismail v. Cohen,* 899 F.2d 183, 187 (2d Cir.1990); *O'Neill,* 839 F.2d at 13. Here, the court will apportion the award equally among Officers Huff and LaSarso based on the fact that Officer Huff, through his failure to intercede, and Officer LaSarso, through striking the plaintiff, equally contributed to the plaintiff's injuries. In a sense, one hand washed the other. As against Officer Huff, the court awards plaintiff $1,000 in punitive damages. As against Officer LaSarso, the court awards plaintiff $1,000 in punitive damages.

The plaintiff is directed to file and serve his fee petition on or before the date that falls thirty days after this Memorandum–Decision and Order is filed by the clerk of the court. Defendants are directed to file and serve their objections, if any, on or before the date which falls twenty-one days after the filing of the fee petition. The court encourages the parties to settle the attorney fees issue. If after a good faith effort they cannot settle the issue, plaintiff's counsel should so notify the court.

## VI. CONCLUSION

The court directs the clerk of the court to enter judgment on behalf of the plaintiff in his Eighth Amendment claim. The damage amounts should be entered as set in the preceding section of this Memorandum–Decision, for a total award in compensatory damages of $9,500, and a total award in punitive damages of $2,000. The clerk of the court is further directed to enter judgment dismissing the plaintiff's state law claims.

It is So Ordered.

---

**15.** In his Post–Trial Memorandum plaintiff does not urge findings or conclusions with respect to his state law claims. He therefore is deemed to have abandoned them, and the court hereby dismisses them.