Wiley DAVIS, Plaintiff–Appellant,

v.

Anibal AGOSTO, Marcus Harris, William Henderson, Steve Hiland, Richard Kent, Lois Lyle, Mike McCarty, Jim Morse, Andrew Rasmussen, Jack Wood, Kentucky Department of Corrections, Phil Parker, Warden, Defendants–Appellees.

No. 02–6141.

United States Court of Appeals, Sixth Circuit.

Feb. 27, 2004.

Christopher N. Lasch, Goodwin & Lasch, Louisville, KY, for Plaintiff–Appellant.

Stephen P. Durham, M. Lee Turpin, Office of General Counsel, Department of Corrections, Frankfort, KY, for Defendant–Appellee.

Before BATCHELDER and SUTTON, Circuit Judges; and BELL, Chief District Judge.[*]

SUTTON, Circuit Judge.

Wiley Davis, an inmate in the Kentucky State Reformatory ("the state prison"), sued several prison officials over injuries he received when corrections officers attempted to restrain him on March 22, 2000. Invoking 42 U.S.C. § 1983, he alleged that the prison officials violated his Eighth and Fourteenth Amendment rights by using excessive force to restrain him and by treating his resulting injuries without his consent. Davis also sought declaratory and injunctive relief against the Kentucky Department of Corrections and Phil Parker, the State prison warden, for failing adequately to train prison officials in the use of force. The district court granted the defendants' motion for summary judgment, and we affirm.

## I.

On March 22, 2000. Davis reached through the tray slot of his cell door (an opening used to deliver food to inmates) and knocked a cup of tea from a correctional officer's hand, splashing two other officers. In response. Jack Wood, a State prison administrator, authorized Lieutenant Marcus Harris to assemble a "move team" to restrain Davis by placing him in "four-point" restraints, a procedure that shackles an inmate's hands and feet to the four corners of the inmate's bed. At the time the move team was assembled, an employee of the prison began to videotape the encounter. The resulting video confirms the following undisputed sequence of events.

The move team was composed of Lieutenant Harris (carrying a handheld electronic stun gun, known as a "taser"), Sergeant Lois Lyle (carrying a can of mace). Officers Agosto and Kent (each carrying batons). Officer Rasmussen (carrying a riot shield with an integrated taser), and Officer Flood (carrying a video camera). In order to handcuff Davis safely, Lieutenant Harris first asked Davis to stand by his cell door with his hands next to the tray slot. Davis refused and remained uncooperative. At this point, Lieutenant Harris directed Sergeant Lyle to spray Davis's cell with mace in order to convince Davis to let the prison guards handcuff him. The mace, however, failed to pacify Davis, who held his mattress against the door to block much of the spray.

Lieutenant Harris then made the decision to open Davis's cell and forcibly subdue him. Officer Rasmussen held the riot shield against the cell door as the officers opened the door. After the door opened, however. Davis slipped past Rasmussen and rushed into the hallway. At that point. Lieutenant Harris tackled Davis and brought him to the ground. From this position, in full view of the other officers. Davis threw his fist toward Lieutenant Harris. Officers Agosto and Kent immediately struck Davis with their batons in response. As Davis lay on the floor.

[*] The Honorable Richard Holmes Bell. Chief Judge for the United States District Court for the Western District of Michigan, sitting by designation.

Officers Kent and Agosto pressed their batons against Davis's head and neck while Lieutenant Harris twisted his arm until Sergeant Lyle could place Davis in handcuffs.

Once Davis had been subdued, the officers called a prison nurse to treat two cuts to Davis's scalp. After deciding that Davis needed sutures, the officers escorted him to the prison infirmary. Jim Morse, an infirmary staff member, sought Davis's consent for the treatment. Davis initially consented to the suturing, but later withdrew his consent after he was told he could refuse medical treatment. Dr. Hiland, a prison physician, eventually examined Davis and ordered Morse to close the wounds on Davis's head. Still defiant. Davis was restrained by officers while Morse treated the cuts with medical staples.

In granting the defendants' motion for summary judgment, the district court first concluded that the corrections officers and medical personnel did not violate Davis's constitutional rights. With respect to the members of the move team, the court determined that the officers made a good faith effort to restore order, and they did not needlessly use force in bringing Davis under control. With respect to the medical personnel, the court concluded that the alleged failure to obtain consent to suture Davis's head wound did not violate his Eighth Amendment rights.

The district court also rejected Davis's claims against the Department of Corrections and Parker for injunctive relief. In its view. Davis had failed to provide any evidence explaining how the Department of Corrections and the State prison warden offered insufficient training. The court concluded in the alternative that Davis had not shown that any alleged failure-to-train caused his injuries.

## II.

We apply familiar principles in determining whether government officials are entitled to qualified immunity. First, "we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to [him], show that the defendant-official's conduct violated a constitutionally protected right; if we answer the first question in the affirmative, we must then determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir.2001); *see Saucier v. Katz* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In applying this test on appeal, the district court's decision receives de novo review. *Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir.1998).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see Caldwell v. Moore*, 968 F.2d 595, 599–600 (6th Cir.1992). And "[i]n determining whether the use of force was wanton or unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7, 112 S.Ct. 995 (quoting *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)); *see Caldwell*, 968 F.2d at 601.

Davis points to several acts that allegedly violated his rights under the Eighth Amendment: (1) Sergeant Lyle's use of mace; (2) the electric shock from Rasmussen's riot shield; (3) Lieutenant Harris's act of grabbing and tackling Davis, and further twisting his arm; (4) the officers' baton strikes to Davis's mid-section and head; and (5) the officers' subsequent application of the batons to Davis's neck and head. These allegations ultimately fall into two categories—the use of mace and the use of physical force to subdue Davis—and we will consider each in turn.

### A.

■ In considering the officers' use of mace, the question for Eighth Amendment purposes is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Caldwell*, 968 F.2d at 600 (internal quotations omitted). The undisputed facts surrounding the officers' use of mace indicate that as a matter of law they made a "good-faith effort to maintain or restore discipline." *Id.* When the move team approached Davis's cell, Lieutenant Harris ordered Davis to place his hands next to the tray slot so that he could be handcuffed. Had Davis complied with this unexceptional request, the subsequent use of mace (to say nothing of batons) would have been unnecessary. But Davis instead refused to comply and remained recalcitrant. Under these circumstances, the officers did not act maliciously or sadistically in using mace to secure Davis's compliance and to restore order—as several cases confirm. *See, e.g., Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir.2002) (affirming summary judgment in favor of prison official and noting "that the use of mace to control a prison inmate is not malicious or sadistic"); *Miller v. Palmer*, No. 99–2352, 2000 WL 1478357, at *2 (6th Cir. Sept. 27, 2000) (officers did not violate the Eighth Amendment when prisoner "refused to remove his arm from his food slot[,] refused to allow officers to place him in soft restraints[, and was] given several opportunities to comply with the officers' orders before chemical agents were used"); *Thomas v. Greene*, No. 99–3179, 1999 WL 1253102, at *1 (6th Cir. Dec. 17, 1999) (officer did not violate the Eighth Amendment when prisoner was "threatening and uncooperative . . . and [the officer] did not use more force than was necessary to cause [the prisoner] to comply with his requests").

### B.

■ A similar conclusion applies to the move team's use of force in attempting to bring Davis under control once they entered his cell. Having failed twice to convince Davis to submit to handcuffs—first through a guard's request, then by the use of mace—the move team opened the door and attempted to enter the cell. Yet after they opened the door, Davis, who weighed 245 pounds and stood six feet three inches tall, forced his way out of the cell, evaded the taser shield, and started down the prison hallway. At this point, the officers applied various forms of non-lethal force to bring Davis under control—a tackle by Lieutenant Harris, the use of the batons as Davis continued to resist and attempted to strike Lieutenant Harris, and the placement of the taser shield against Davis's back (without shocking him). In view of the officers' prior unsuccessful efforts to convince Davis to submit to them, in view of Davis's decision to force himself out of the cell and in view of Davis's continued resistance even after being tackled, these appropriately-incremental increases in the use of force by the officers did not as a matter of law violate his Eighth Amendment rights. The tackle, the twisting of Davis's arm until the handcuffs were in

place, the use of the batons to keep Davis's head down and the use of the taser shield were appropriate, if not indispensable, under the circumstances. And while it cannot be said that the three baton blows were indispensable, they occurred only after Davis continued to resist and indeed attempted to strike Lieutenant Harris, and most critically they occurred during the brief interval between when the officers lost control of the resisting inmate and when they brought him under control.

These uses of force under these split-second circumstances do not "evince[ ] such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). At this point in the encounter. "[p]rison officials had no way of knowing what direction matters would take." *id.* at 323, either with respect to Davis's attempt to strike Lieutenant Harris or with respect to the officers' ability to bring him under control. "Faced with such sudden wrongful and quite possible harmful conduct, the prison official on the scene does not have the luxury of hindsight and reflection." *Ort v. White,* 813 F.2d 318, 322 (11th Cir.1987). Under these circumstances, the officers did not violate Davis's constitutional rights. *See also Jones v. Huff,* 789 F.Supp. 526, 535 (N.D.N.Y.1992) ("Officer LaSarso's punch to plaintiff['s head] was administered in an effort to restore discipline in the face of plaintiff's deliberate disobedience in ignoring a repeated order to stop walking, and in subsequently striking Officer Huff."); *Morrison v. Martin,* 755 F.Supp. 683, 688–90 (E.D.N.C.1990) (continued use of force was proper when prisoner attempted to strike an officer, resisted shackling, refused to walk, and refused to sit); *Smith v. Dooley,* 591 F.Supp. 1157, 1161, 1168 (W.D.La.1984) (three officers properly tackled and force-

fully subdued inmate who refused to leave cell, brandished a small pen knife, and resisted chemical spray).

"Unless it appears," the Supreme Court has instructed. "that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain .... the case should not go to the jury." *Whitley,* 475 U.S. at 322. No such "reliable inference[s] of wantonness" exist under these circumstances, and accordingly the district court correctly rejected Davis's Eighth Amendment claim as a matter of law.

### C.

Davis further claims that prison officials subjected him to cruel and unusual punishment by placing him in "four-point" restraints. Davis, however, failed to raise this claim in his complaint and cannot now raise the claim for the first time on appeal. *See Vaughn v. Lawrenceburg Power Sys.,* 269 F.3d 703, 714 (6th Cir.2001).

All that Davis alleged in his complaint was that he "was assaulted twice by Defendants"–the first assault he describes as involving pepper spray, electric shocks, and batons, and the second assault he describes as involving forced medical treatment. As pleaded in the complaint, his federal-law causes of action never mention the initial decision of the officers to try to place him in "four-point" restraints for knocking tea from an officer's hand or the officers' later decision to place him in "four-point" restraints after he received medical treatment. While it is difficult to understand the officers' decision to confront Davis immediately after the tea-slapping incident, rather than allowing this mentally-ill inmate to calm down in the confines of a single cell located in the maximum-security wing of the prison, the failure to plead any such claim prevents us

from questioning the district court's decision not to consider the claim and deprives us of authority to look at the claim in the first instance.

## III.

Davis next challenges his receipt of medical treatment—the suturing of the cut to his head—which he initially accepted but which he then protested once he was told he could decline treatment. Because it is unclear whether Davis challenges this medical treatment on Fourteenth Amendment liberty-interest grounds or on Eighth Amendment excessive-force grounds, we will consider the claim in both contexts.

We turn first to the Fourteenth Amendment liberty-interest claim. While "[t]he Supreme Court has held that individuals in state custody enjoy [a] protectable liberty interest[ ] ... to refuse medical treatment." *Noble v. Schmitt,* 87 F.3d 157, 161 (6th Cir.1996), that right is not absolute and is particularly susceptible to regulation in the prison setting.

In *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Court upheld a state regulation permitting officials forcibly to medicate a mentally-ill prisoner against a similar challenge. While granting the important liberty interest at stake. *id.* at 221–23, the Court recognized the "legitimacy, and the necessity, of considering the State's interests in prison safety and security." *id.* at 223. After balancing Washington's interest in maintaining safe prisons against the inmate's liberty interest, the Court determined that the forced medication of a prisoner did not violate the Due Process Clause. *See id.* at 236 ("[W]e hold that the regulation ... is an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others.").

In the aftermath of *Harper,* federal and state courts have balanced these interests comparably. *See McCormick v. Stalder,* 105 F.3d 1059, 1062 (5th Cir.1997) (due process does not prevent prison officials from forcing a prisoner to undergo treatment for tuberculosis); *Martinez v. Turner,* 977 F.2d 421, 423 (8th Cir.1992) (rejecting constitutional challenge to decision by prison officials to force-feed an inmate to preserve his health after a hunger strike); *State ex rel. Schuetzle v. Vogel,* 537 N.W.2d 358, 364 (N.D.1995) (future medical cost of allowing diabetic prisoner to refuse treatment justified forced injections of insulin); *see also Sconiers v. Jarvis,* 458 F.Supp. 37, 40 (D.Kan.1978) ("[D]efendants had an affirmative constitutional duty to provide necessary medical treatment regardless of consent because intentional denial of medical treatment ... constitutes cruel and unusual punishment.").

■ We reach a similar conclusion here—in what seems to be an easier case than *Harper* and these other decisions. Davis had an open would, which in Dr. Hiland's undisputed opinion required suturing. It was well within the authority of the medical officials at the prison to determine that closing the wound was necessary to the health and safety of Davis as well as to those around him. Had they opted not to provide the treatment, the officials could have subjected themselves to a deliberate-indifference claim and would of course have remained responsible for providing any further medical treatment prompted by the failure to close the wound. On this undisputed record, the performance of this routine, one-time, medically-necessary procedure did not violate Davis's Fourteenth Amendment rights.

■ Davis's Eighth Amendment claim fares no better. Indeed, he premises the claim entirely on his assertion that the forced medical treatment violated the Fourteenth Amendment. In full, Davis argues:

> Because the forced administration of unwanted medical treatment violated the constitution, a reasonable jury could conclude that any and all force employed or authorized by Marcus Harris in order to permit Jim Morse to render the unwanted treatment was an "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

Appellant's Br. at 30. As we have already explained, however, Davis's treatment did not violate the Fourteenth Amendment, and Davis has pointed to no legal authority establishing that this treatment was otherwise unconstitutional. As the sequence of medical events suggests, this one-time, medically-necessary procedure was far from "unnecessary and wanton," and indeed was necessary to close an open wound that posed a threat to Davis's health and safety. Such sensible actions by prison officials do not violate the Eighth Amendment.

## IV.

Davis finally argues that the district court erred in granting summary judgment on his failure-to-train claim because the district court failed to give Davis an adequate opportunity to discover sufficient evidence to support the claim. We review a district court's decision concerning the scope of discovery for abuse of discretion. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 627 (6th Cir.2002).

Davis filed his failure-to-train claim on March 22, 2001. He waited until December 13, 2001—approximately one month before the expiration of the discovery deadline—to schedule eleven depositions, some of which presumably were in support of his failure-to-train allegations. Before taking any of these depositions and without moving the court for an extension of the discovery deadline, however, Davis consented to the defendants' motion to stay the depositions pending the outcome of their summary judgment motion. In Davis's response to this motion, he stated that "[t]he defendants do not seek a stay of other discovery." Mem. in Resp. to Defs.' Mot. for Protective Order. Davis, however, fails to explain why he did not use "other discovery" to gather evidence in support of his failure-to-train claim. In the light of this sequence of events and in view of Davis's decision not to seek an extension of discovery (or take the scheduled depositions), the district court's ruling did not amount to an abuse of discretion.

## V.

For the foregoing reasons, we affirm.