**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0509n.06

Case No. 15-6196

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Aug 26, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CELEDONIO AYALA-ROSALES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JOHN PHILIP TEAL, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, ROGERS, and SUTTON, Circuit Judges.

**SILER**, Circuit Judge. Plaintiff Celedonio Ayala-Rosales ("Ayala") appeals the district court's entry of summary judgment in favor of Officer John Teal on Ayala's 42 U.S.C. § 1983 claim that Teal used excessive force against him. For the reasons that follow, we AFFIRM.

**Factual and Procedural Background**

In 2013, Ayala got drunk at his home and was driven to a Waffle House restaurant by his brother. His altered state left him unable to recall many of the events at issue. Waffle House employees called the police after Ayala acted strangely. Manchester Police Officer Nilesh Patel arrested Ayala for public intoxication.

During the drive to the Coffee County jail, Ayala screamed and banged his handcuffs against the patrol car's window and door. Upon arrival, he initially resisted Patel's efforts to move him into the jail's secured entrance.

Four officers then led Ayala to the jail's "drunk tank," i.e., its holding cell for intoxicated arrestees. Ayala was "talking real loud, screaming, just not listening to anything," and "causing a disturbance." Given the potential disruption, Officers Patel and Mitchell West, along with Coffee County Sheriff's Deputy Dakota Bowen and Coffee County Corrections Officer Teal, escorted Ayala to the cell.

The officers agree that as Teal attempted to get Ayala into the drunk tank, both fell onto the concrete floor and Teal landed on top of Ayala. The fall left Ayala with a skull fracture.

Teal testified that he searched Ayala in the hallway and ordered him to enter the drunk tank. Ayala allegedly refused to comply and instead grabbed on to the cell door. Teal testified that he then moved into the cell, stood behind Ayala, and tried to pull Ayala into the cell.

According to Teal, Ayala then let go of the door with his right arm in an attempt to "take a swing" at one of the officers. With his right arm free and with Teal continuing to pull him, Ayala's left hand came loose from the cell door, causing both men to fall backward. Teal fell on top of Ayala, who landed on his stomach.

But Teal's deposition testimony differs from his written report of the encounter. The written report provides, in relevant part:

> [Ayala-]Rosales was still in handcuffs as he was patted down by the tank door. While the tank door was being opened, [Ayala-]Rosales was standing against the wall yelling and causing a disturbance. [Ayala-]Rosales was instructed to walk into the tank and have a seat at which . . . point he refused and grabbed hold of the door with both hands. [Ayala-]Rosales was instructed to let go of the door and to go inside the tank, at which point he

> tightened his grip on the door and resisted being physically put into the tank. I then grabbed [Ayala-]Rosales from behind and began *pushing* him inside the tank. [Ayala-]Rosales continued to resist and was removed from the door and *was taken down to the ground for not complying with direct orders, and showing signs of aggression.*

In his second deposition, Teal explained that his report was "not completely" accurate. He admitted that he failed to note in the report that he had tried to push Ayala on the chest to move him into the cell. Teal also failed to explain why he did not write that Ayala had taken a swing at one of the officers. Moreover, Teal admitted that he documented pushing, not pulling, Ayala into the cell, contrary to his earlier deposition testimony. Confronted with this discrepancy, Teal maintained that he simply "put the wrong word" in the written report. As to the suggestion that Teal intentionally "[took] [Ayala-]Rosales to the ground" due to his failure to comply with direct orders, Teal responded, "I didn't take him to the ground. We fell." He did not remember why he documented otherwise in the report.

Officer Patel testified that immediately preceding the incident, Teal asked Ayala to move into the cell. According to Patel, Ayala refused to comply; instead, he "just held onto the doors leading into the drunk tank and wouldn't let go." Patel clarified that Teal was directly behind Ayala at the time of the fall.

According to Officer West, Teal stood in front of Ayala immediately before entering the drunk tank while attempting to remove Ayala's belt and shoes. West stated that when Ayala refused to cooperate, Teal ordered him to enter the drunk tank, but Ayala again refused, grabbing onto the door. West also testified that Teal, attempting to loosen Ayala's hands, "tried to get him to let loose" by "grabb[ing] at his hands." In the ensuing "scuffle," "it looked like they tripped over each other." West testified that the resulting fall did not appear to be deliberate and that Teal had not purposefully thrown Ayala to the floor.

Like his colleagues, Officer Bowen recalled that Ayala, obviously intoxicated, refused to comply with orders to enter the drunk tank. But contrary to his deposition testimony, Bowen's written account did not state that Ayala had attempted to swing at any of the officers.

There is no dispute that although Teal stood up immediately after the fall, Ayala remained on the floor, unconscious and bleeding. Teal confirmed that Ayala was breathing, checked his pulse, and attempted to locate the source of the blood. Bowen and Teal lifted Ayala from the floor and placed him into a wheelchair. Ayala remained unconscious until he arrived at the medical unit, when he opened his eyes and "started trying to swing" his fist at Teal and Bowen. Jail personnel transported Ayala to a hospital in Manchester, Tennessee. He was later transferred to Vanderbilt University Hospital, where he was treated for a skull fracture and bleeding from the ear.

Ricky Lee Gentry and Jason Dendy of the Coffee County Sheriff's Department investigated the incident. Both reviewed the incident report and footage from a surveillance camera posted in a hallway near the drunk tank. Though the video showed Ayala being escorted down the hallway leading to the drunk tank, the camera was not positioned to film the cell's entrance. Accordingly, there is no footage of the area where Teal utilized force. Having encountered no evidence of excessive force, Gentry did not save the video footage from routine destruction.

As stated above, Ayala concedes that his intoxicated state left him largely unable to remember the night in question. He does not recall going to the Waffle House or causing a disturbance once there. He does not remember being handcuffed, arrested, or transported to the jail, nor does he recall the incident at issue.

Ayala alleged excessive force and state-law claims for assault, battery, and negligence against Teal. The district court determined that Teal's use of force was reasonable and granted his motion for summary judgment.

**Standard of Review**

We review a district court's award of summary judgment de novo. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894-95 (6th Cir. 2004) (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996)).

**Discussion**

Though Ayala contends that his Fourth Amendment rights were violated, the district court correctly looked to *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and concluded that Ayala's claim is instead governed by the Fourteenth Amendment's due process clause. *Kingsley* clarified that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473.

*Kingsley*'s holding is not to be applied "mechanically." *Id.* Rather, we must consider "the facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Moreover, we must account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

*Kingsley* suggests that the following considerations may prove relevant to a determination of excessive force: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper

or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The district court thoughtfully and properly analyzed these factors.

Teal argues that he did not intend to injure Ayala but acted in a good-faith effort to restore order. He argues that we should consider his subjective intent, pointing to *Kingsley's* citation of *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973). *See Kingsley*, 135 S. Ct. at 2475-76 (citing *Glick*, 481 F.2d 1028). However, *Kingsley* noted that *Glick* offered little support for a subjective legal standard. The Court acknowledged Judge Friendly's observation that in determining whether intentional use of force "'crosse[s]' the 'constitutional line,'" a court should look "to such factors as . . . whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 2476 (quoting *Glick*, 481 F.2d at 1033). But *Kingsley* distanced itself from this proposition, finding that *Glick* "does not suggest that . . . malicious and sadistic purpose to cause harm . . . is a *necessary* condition for liability. To the contrary, the words 'such . . . as' make clear that the . . . factors provide examples of some considerations, among others, that might help show that the use of force was excessive." *Id*. Therefore, Teal's subjective intent is not determinative. *See Jones v. City of Cincinnati*, 736 F.3d 688, 695-96 (6th Cir. 2012) (noting that "courts eschew considering an officer's subjective intent when applying the objective reasonableness test," though "an officer's explanation of his motivations inform a court's understanding about what an objectively reasonable officer would have done under such circumstances.").

Ayala insists that because the witnesses' accounts of the encounter differ, summary judgment was improper. But not every factual dispute bars summary judgment; rather, "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

The district court acknowledged "minor inconsistencies in [Teal's] summary judgment evidence." These accounts fail to raise genuine issues of material fact suggesting that Teal's use of force was objectively unreasonable.

Several of Ayala's contentions may be easily disposed of. For example, he insists that there is no evidence that Patel and West escorted Ayala and the other officers to the drunk tank because Ayala was being uncooperative. To the contrary, Patel testified that he accompanied the group into the cell area for this very reason. Similarly, Ayala asserts that there is little evidence that force was required to move him from the patrol car into the jail. But Patel's deposition testimony again reflects the opposite.

More significantly, Ayala challenges the court's finding that "Teal first attempted to use lesser force by pushing or pulling [Ayala] to get his grip on the door to break loose. However, he was unsuccessful; at that point, the use of a greater amount of force was justified in order to break [Ayala's] grip on the door and secure him in the cell." Ayala points to Officer Bowen's statement that "Mr. Ayala was not holding onto the drunk tank door before Officer Teal attempted to lift under his arms and pull him inside the tank from behind."

But Bowen's telling of the encounter does Ayala few favors. According to Bowen, Ayala ignored multiple orders to step inside the tank; as a result, Teal "lifted underneath his arms and stepped behind him to pull him into the tank." After Teal's first attempt to move Ayala into the cell was unsuccessful, Ayala grabbed onto the door with one arm and used the other to swing at

Teal. When Bowen loosened Ayala's grip, Teal spun Ayala around and both men fell. Even assuming the veracity of this account, there is no evidence that Teal's conduct was unreasonable.

Ayala also emphasizes the testimony of Gentry and Dendy, who reviewed the surveillance footage in their internal investigation. But the camera's position prevented Gentry and Dendy from viewing footage of the inside of the drunk tank. Once the officers and Ayala turned a corner at the cell's entrance, they were out of the camera's view. The investigators' inability to view the drunk tank does not raise a genuine issue of material fact.

Finally, Ayala argues that Teal "did not attempt to limit the amount of force he exerted" before taking Ayala to the ground. He alleges that by failing to utilize lesser forms of force, Teal violated certain departmental policies. However, as the district court noted, "[T]he law does not require officers to use progressive force nor does it prescribe the ideal type or amount of force allowed. Instead, it requires only objectively reasonable force based on all of the facts and circumstances surrounding its use." Accordingly, Teal's alleged departure from local policy is not determinative. *See Whren v. United States*, 517 U.S. 806, 807 (1996) ("Nor can the Fourth Amendment's protections be thought to vary from place to place and from to time, which would be the consequence of assessing the reasonableness of police conduct in light of local law enforcement practices.").

The district court's judgment is buttressed by *Griffin v. Hardrick*, 604 F.3d 949 (6th Cir. 2010). Griffin, a pretrial detainee, left her holding cell with permission to speak with a nurse about certain injuries. When the nurse advised Griffin that she would not be transported to a local hospital, Griffin raised her voice. Hardrick, the defendant corrections officer, then approached Griffin, who walked away when he attempted to speak with her. When Hardrick grasped one of Griffin's arms, she attempted to pull away; she again pulled away when a second

officer reached for her other arm. Security camera footage revealed that as the two officers began leading Griffin down the hallway, she resisted. Hardrick then performed a "'leg-sweep maneuver,' typically used by officers to bring a noncompliant individual to the ground with the least amount of force necessary." *Id.* at 952. Griffin tripped over Hardrick's leg and fell to the floor. The assisting officer fell on top of Griffin, causing Griffin to suffer a fractured tibia.

Applying pre-*Kingsley* precedent, we analyzed Griffin's § 1983 claim according to the Eighth Amendment standard, considering whether Hardrick's conduct was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 954 (quoting *Watkins v. Evans*, 96 F.3d 1449, 1996 WL 499094, at \*2 (6th Cir. Sept. 3, 1996)). Though this standard differs from *Kingsley*'s inquiry as to objective reasonableness, both inquiries consider "whether the use of force could plausibly have been thought necessary." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

*Griffin* explained that an official's decision to use force to control a prison disturbance is entitled to deference.

> [O]fficials confronted with a prison disturbance must balance the threat [that] unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

*Id.* (quoting *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (citations and internal quotation marks omitted)). Therefore, we concluded that the grant of summary judgment to Hardrick was not erroneous. *Id.* at 956.

*Griffin*'s logic applies here. Despite the lack of unanimity regarding various details of the encounter, the material facts are not in dispute. Although witnesses offered differing accounts, none of the disputed facts was essential to a determination that Teal's use of force was not objectively unreasonable. *See Graham*, 490 U.S. at 397. Therefore, the court did not err in granting summary judgment to Teal.

AFFIRMED.