NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0018n.06

No. 21-1222

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

TRENT YOUNG,

     Plaintiff-Appellee,

v.

KENT COUNTY SHERIFF'S DEPARTMENT,

     Defendant,

WILLIAM JOURDEN; BRYAN CLARK,

     Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jan 10, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

Before: BOGGS, GRIFFIN, and MURPHY, Circuit Judges.

BOGGS, Circuit Judge. While awaiting trial in a Michigan jail, Plaintiff Trent Young propped open a door to a secure hallway in violation of the jail's rules. Deputy William Jourden pepper sprayed Young and video evidence shows Young then walking away from the door. Young states that he was returning to his cell when Jourden and Deputy Bryan Clark moved from the doorway into the jail's dayroom, where Jourden allegedly pepper sprayed Young a second time and Clark tased Young while Young paused to wipe his face. Young sued defendants pursuant to 42 U.S.C. § 1983 for use of excessive force. The district court granted Jourden qualified immunity for the first pepper spray, and Young does not appeal that ruling. The district court denied Jourden and Clark qualified immunity for the second pepper spray and the tasing, which they appeal.

I.      Facts.

This case arises from an encounter in 2019 at the Kent County Correctional Facility ("KCCF"), where Young was housed as a pretrial detainee on criminal charges pending in state court.   KCCF is a circular building with inmate cells located on the outside walls along its circumference.  Young was housed in Pod "D3A," which denotes building D, floor 3, and the "A pod," or side of the floor.  A control center divides floor D3 into two pods, Pod D3A and Pod D3B. The control center is surrounded by a hallway that has secure doors leading to the two pods.  The area between the secure doors and the inmate cells is known as the dayroom—a communal space that inmates are permitted to use during specified times of the day.  Each dayroom contains a standing control deck, which allows officers to communicate with prisoners in their cells, and to open and close the cell doors.  The control deck is located inside the pod approximately fifteen feet from the secure door to the hallway and controls access to that door with the use of a key. Deputies can open the cells and doors from both the control center and the control deck.  The dayroom also contains movable objects, such as chairs, trash cans and broom or mop sticks that could be used as weapons.

Floor D3 is typically supervised by two deputies, one assigned to each pod, with each deputy providing support to the other.  Floor D3 is medium level security, which is higher than most other parts of the jail and thus poses a higher security risk.  Deputies at KCCF carry canisters filled with oleoresin capsicum ("OC spray"), a type of pepper spray that provides a low-level force option for obtaining inmate compliance and control.  Jourden routinely supervised Pod D3A where Young was housed and, therefore, was familiar with Young.

On appeal, the following facts are not disputed.  Inmates receive their medications through a process known as "med-line" or "med pass."  Med-line occurs twice per day, once in the morning

and once in the evening. On February 22, 2019, Jourden was supervising Pod D3A and Clark was supervising Pod D3B. At approximately 6:00 p.m., a medical assistant, Jessica Fusik, brought a med-cart to Pod D3A to administer medications to inmates. Per procedure, Deputy Jourden called inmates out of their cells and supervised the med-line to ensure that they received their medications in an orderly manner.

When Jourden paged Young to come out of his cell to receive cortisone cream for his eczema, Young responded, "I'm cool," and he did not come out of his cell for his medication. About 10 to 15 minutes later, Jourden told Young over the two-way speaker that he needed to come out of his cell to sign a medication refusal slip if he did not want to take his medication. Changing his mind, Young came to the med-line asking for his medicine. But he did not have his medicine cup and went back to his cell to get it.[1] When Young reached his cell, the door was locked, so he waved his hand toward the control deck to allow him into the cell, but he saw Jourden and Fusik beginning to walk toward the secure door to leave.

Young approached Jourdan and Fusik and stated, "Why are you leaving? I did not get my medication." Fusik told Young that med-line was over, and Jourden told Young, "You are done. You just want to run around." Young followed Jourden and Fusik as they exited the pod through the secure door. As the door began to automatically close behind them, Young put his foot in the door to stop it from closing and continued to ask Fusik for his medication, but she would not give it to him. Young eventually switched to using his hand to hold the door open, knowing that the door would close by itself if he did not hold it open. By preventing the door from closing. Young was violating KCCF's rules set forth in the Inmate Handbook. Jourden returned to the door, telling Young not to step into the hallway. Young remained in the doorway using his arm to hold the

---

[1] Young was also supposed to receive ear drops, but the medical assistant told Young that she did not have them.

door open and demanding his medicine. Jourden again told Young, "You done . . . You done. You just want to run around and play." Jourden attempted to close the door but Young stood in the way.

After nearly two minutes with Young remaining in the doorway, Jourden grabbed the security door, pulled his cannister of OC spray from his waistband, and pointed it directly toward Young. Young did not leave the area or return to his cell. Instead, he stepped back while Jourden kept his OC spray pointed at him and he continued to argue about not getting his cortisone cream. After about 15 seconds, Jourden deployed his OC spray. Young turned his head and apparently avoided the spray at first, but Jourden hit him with a second spray when Young turned his head back to face Jourden. Young then turned around and walked back into the dayroom and out of view of the security camera. When Jourden deployed his OC spray, some of the spray hit the doorframe and ricocheted back into Jourden's own eyes. Video shows Jourden retreating into the hallway where he radioed for backup. Deputy Clark is seen joining Jourden seconds later and then following him into the dayroom as the secure door closes behind them, locking them in the pod. The deputies could only reenter the secured hallway if Jourden inserted his key to into the pod control deck, but he was having trouble seeing.

What happened next is disputed and the critical piece of evidence is a security video which shows most, but not all, of the events that followed. Jourden and Clark state that they repeatedly told Young to get to the ground, but Young testified that he did not hear either deputy say anything and that he was headed back to his cell. The magistrate judge determined that, although the video has no sound, Jourden and Clark appear to be yelling commands at Young, who failed to comply by continuing to walk around and wipe the spray off his face with his shirt or a towel. The district

court held that although these inferences were reasonable, they "are not so obvious that the Court can disregard Plaintiff's sworn statements to the contrary." The district court held that

> [T]he video evidence does not clearly show either of these things. It does not show very much of what Plaintiff did after Defendant Jourden first sprayed him in the face by the secured door. It shows Plaintiff wipe his eyes and face with his shirt before walking off camera, confirming that he had been sprayed in the face at least once. It then shows Defendant Jourden walk in Plaintiff's direction, point his pepper spray in that same direction, and then step back, just before Plaintiff's head and torso briefly return to view and then disappear again, moving perpendicular to and away from Defendants Jourden and Clark. As Plaintiff is walking away and out of view, Defendant Clark raises his taser and points it toward Plaintiff's back. Defendant Jourden points to the ground at several points during this brief period, but there is no audio, so the video does not confirm whether Jourden or Clark instructed Plaintiff to get on the ground or issued any other commands. . . . This is not a case where Plaintiff's version of the events is "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Young testified in deposition that Jourden sprayed him a second time with OC spray as he walked off camera further into the dayroom and toward his cell. Jourden denies spraying Young a second time. Young also states that he was tased by Clark while he stopped to rub his eyes from the OC spray. The incident ends with Jourden reappearing on the video as he walks back to the control deck, where he inserts his key to open the secure door, allowing other deputies, who had been watching events unfold from the hallway, to enter. After Young was handcuffed, the other KCCF personnel provided him medical care. Following the incident, Young pled guilty to the rule infraction of "failure to lock up."

Young brought a civil-rights action against Deputies Jourden and Clark under 42 U.S.C. § 1983 for excessive force. The district court, adopting the report and recommendation of a magistrate judge, dismissed Young's excessive-force claim as to Jourden's use of pepper spray by the doorway. But the district court denied qualified immunity to Jourden for his alleged use of pepper spray in the dayroom and to Clark for his undisputed use of a taser in the dayroom. Jourden and Clark appeal the district court's denial of qualified immunity.

II.     Scope of Jurisdiction and Standard of Review.

We review the district court's denial of qualified immunity de novo. *See Bey v. Falk*, 946 F.3d 304, 311 (6th Cir. 2019). However, we have jurisdiction over an interlocutory appeal, like this one, only to the extent that defendants limit their arguments to "questions of law premised on facts taken in the light most favorable to the plaintiff." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (citing *Phillips v. Roane Cty., Tenn.,* 534 F.3d 531, 538 (6th Cir. 2008). "In other words, a defendant may not appeal a denial of a motion for summary judgment based on qualified immunity 'insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Ibid.* (citing *Johnson v. Jones*, 515 U.S. 304, 320 (1995)).

There are two narrow circumstances in which an interlocutory appeal may address some dispute of fact. First, we may overlook a factual dispute if a defendant is willing to concede the most plaintiff-favorable view of the facts for purposes of the appeal. *Ibid.* Second, in "exceptional circumstances" we may decide an appeal challenging the district court's factual determination if that determination is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Ibid.* Absent such a contradiction, we defer to the district court's determinations of fact.[2] Beyond those two circumstances, "a defendant may not challenge the inferences that the district court draws from those facts, as that too is a prohibited fact-based appeal." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). As a result, we "need look no further than the district court's opinion." *Ibid*.

---

[2] When we refer to a district court's "determinations of facts," we do not mean a factual finding that is binding at all further stages of litigation. A jury ultimately may find facts different than those stated by the district court in denying qualified immunity. Rather, we mean, on appeal from a denial of qualified immunity, that the district court has determined that certain events are facts when looking at the record in the light most favorable to the plaintiff and drawing all reasonable inferences therefrom. It is these determinations that we cannot disregard on this appeal.

III. Qualified Immunity for Second Use of Pepper Spray and Taser

Qualified immunity protects state actors performing discretionary functions from liability under § 1983 unless 1) their conduct violated a federal statutory or constitutional right, and 2) the unlawfulness of their conduct was clearly established at the time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). We can examine these two steps in any order and a government official is entitled to qualified immunity if either step is not satisfied. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In 2015, the Supreme Court held that the use of excessive force on pretrial detainees is measured under the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Under *Kingsley*, the relevant inquiry is whether the force purposefully or knowingly used against a detainee was objectively reasonable. *Ibid*. This totality-of-the-circumstances test balances Young's interest in bodily integrity against the deputies' interest in safety, taking into account such factors as whether the deputies' force was commensurate with the threat that Young posed. Defendants do not challenge the district court's finding that Young has shown that the deputies used excessive force under this objective test.

Young also must show that the deputies' actions violated "clearly established" law such that every reasonable officer would be able to recognize the unconstitutionality of the deputies' use of force. *Wesby*, 138 S. Ct. at 589. Outside the jail setting, it is clearly established that an officer cannot use pepper spray against an arrestee who is "restrained or subdued." *Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 287 (6th Cir. 2020) (collecting cases including, *inter alia*, *Adams v. Metiva*, 31 F.3d 375, 386-87 (6th Cir. 1994) (concluding that a "reasonable person would know that spraying mace on a blinded and incapacitated person sitting in a car would violate the right to be free from excessive force") and *Shreve v. Jessamine County Fiscal Ct.*, 453 F.3d 681,

687 (6th Cir. 2006) (concluding that officers used excessive force when beating an arrestee after she was "out of it" from an initial pepper spray)). Given the district court's determinations of fact that Young was partially incapacitated from the first pepper spray, subdued, non-violent, and non-threatening [R. 100 at PID 854], if Jourden and Young had been interacting in the outside world, Young's right to be free from the second pepper spray would be clearly established.

Inside a jail, correctional officers may use "chemical agents against recalcitrant prisoners" for disobeying orders. *See Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992). This court has upheld qualified immunity in numerous excessive-force cases where prisoners continued to violently physically struggle. *See, e.g., Shreve v. Franklin County*, 743 F.3d 126, 129-30, 135-36 (officers appropriately tased an inmate multiple times because he continued to "thrash about" and struggle against the *five* deputies who were trying to handcuff him); *Jennings v. Peiffer*, 110 F. App'x 643 (6th Cir. 2004) (officers used chemical agents twice against an inmate who continued to refuse to back up to his cell door to be restrained, and the first spray into the inmate's cell had not incapacitated him); *Davis v. Agosto*, 89 F. App'x 523, 526-27 (6th Cir. 2004) (officers appropriately continued to use non-lethal force when, after being maced, inmate forced his way out of a cell and "rushed" into a hallway). But these cases do not address the situation here where the district court determined that, taking the facts in the light most favorable to the plaintiff, Young was subdued and partially incapacitated by the first pepper spray, rendering him non-violent and non-threatening.

The district court determined that after the first pepper spray "[a]lthough Plaintiff had not been restrained by handcuffs, taking the facts most favorable to him, he had been subdued by the first use of [pepper] spray and was neither being violent nor posing a threat to himself or others." Similar facts were addressed in *Guy v. Metro. Gov't of Nashville & Davidson County*, 687 F.

App'x 471 (6th Cir. 2017). There, Amy Guy, a pretrial detainee, asked to see a nurse. *Id*. at 473. Officer Janie Romines, who was assigned to supervise 40-50 female inmates in one pod, ordered Guy to her cell. *Ibid*. When Guy did not move, Romines placed an open left hand on Guy's right shoulder and nudged her towards her cell. *Ibid*. Guy walked slowly, hesitated briefly, and turned to face Romines—at which time Romines pepper sprayed Guy. *Ibid*. This court, applying the more demanding standard of the Eighth Amendment, found that

> a reasonable officer would have been on notice in September 2013 that use of a chemical agent on a non-threatening pretrial detainee who did not comply with the officer's verbal orders and then passively resisted an open-handed escort by hesitating and stopping to turn to ask again about seeing a nurse would amount to constitutionally excessive force. The denial of qualified immunity with respect to this claim was not error.

*Id*. at 476. Guy was "non-threatening" and "passively resist[ing.]" *Id.* at 473. Similarly, here the district court concluded that Young was "passively resisting and non-threatening." A case does not need to be "directly on point," with identical facts to put defendants on notice. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Although Guy had not engaged in any prison infractions and had not been combative, here, when viewing the facts in light most favorable to Young, as we must, the combative situation had been diffused after the first pepper spray. As set forth in *Guy*, a reasonable officer would have been on notice in February 2019 that using a chemical agent on a subdued, partially incapacitated detainee who did not comply with officer's orders would amount to constitutionally excessive force.

Defendants argue that because *Guy* is an unpublished case, it cannot be binding authority that puts officers on notice of a clearly established right. However, we agree with the district court that "binding authority" is not required to overcome qualified immunity. "Clearly established" for purposes of qualified immunity "means there must either be 'controlling authority or a robust consensus of cases of persuasive authority.'" *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)

(quoting *Plumhoff v. Rickard*, 572 U.S. 765 (2014)). In addition, "an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Id.* at 933 (quoting *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015)).

On appeal, defendants state that they accept plaintiff's version of events as true (*see* Appellants' Brief at 12 n.6), yet they insist that Young had not been subdued and that Young was refusing to comply with their orders even after he had been pepper sprayed the first time (*see, e.g.*, Appellants' Brief at 23). But whether Young refused to comply is a disputed issue of fact and there is a genuine issue whether Young resisted at all after walking away from the secured door. We may not take the deputies' view of the facts at this stage unless the district court's conclusions are blatantly contradicted by the record. Defendants do not raise this argument and the events in question occurred off-camera, so there is no blatantly contradictory record evidence. Thus, we are bound to accept the district court's determinations of fact, and if we do so, Jourden's second use of OC spray violated Young's clearly established right to be free from excessive force.

Likewise, Clark is not entitled to qualified immunity for tasing Young where Young was partially incapacitated by the time he was tased. Young testified that he was never warned he would be tased and was returning to his cell. Passive resistance includes noncompliance with an officer's order without evidence of "volitional and conscious defiance" of that order. *Eldridge v. City of Warren*, 533 F. App'x 529, 533-34 (6th Cir. 2014). But taking the facts in the light most favorable to Young, as the district court did, a reasonable jury could conclude that Young did not consciously defy the officer's orders. Where an individual is complying and at most passively resisting, tasing would violate a clearly established right. *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). Here, based on the district court's factual determination

that Young's resistance was passive, not active, the use of a taser against him would be a violation of his clearly established constitutional rights.

Ultimately, the outcome of this case rests on how the jury views the facts, and who the jury finds most credible. Put simply, if Young was fully subdued and incapacitated and did not see or hear any orders to get on the ground, a second or third use of force was excessive. On this record, it is possible that a jury could find the facts to be so. But the jury could just as easily view any one of those facts in the deputies' favor. And it is not this court's place to determine which is correct: "Where, as here, the legal question of qualified immunity turns on which version of facts one accepts, the jury, not the judge, must determine liability." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). We must defer to the district court's determination of facts in favor of Young.

IV.     Conclusion

We AFFIRM the district court's denial of qualified immunity on the claims appealed.

MURPHY, Circuit Judge, dissenting. The Supreme Court recently made one thing clear when summarily reversing circuit courts for refusing to grant qualified immunity to officers: A plaintiff alleging an excessive-force claim under 42 U.S.C. § 1983 generally "must identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). And a case cannot satisfy this notice requirement if its facts are "materially distinguishable" from the facts that the officers confronted. *Id.*; *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (per curiam). My colleagues depart from the Supreme Court's framework by denying qualified immunity to Deputies William Jourden and Bryan Clark for their use of pepper spray and a taser on a pretrial detainee who violated a jail's security-based rules. The cases on which my colleagues rely to find the deputies' actions unlawful are "materially distinguishable" from this case in obvious ways. *Rivas-Villegas*, 142 S. Ct. at 8. Most of the cases, for example, did not involve this jail setting—a setting with unique dangers and security needs. So none gave the deputies the "fair notice" that the Supreme Court demands. *Id.* at 7. I thus respectfully dissent from the denial of qualified immunity.

The events of this case occurred at a Michigan jail on February 22, 2019. Trent Young was awaiting trial after he used counterfeit money, crashed his car while fleeing officers, and struggled with them when they tried to arrest him. Jail administrators housed Young on a medium-security floor that posed a higher security risk than most areas of the jail. Jourden and Clark were supervising this floor, one deputy for each of the floor's two "pods." The floor was approaching full capacity with 87 inmates in one pod and 89 in the other. During the evening "med-line" in Young's pod, he argued with Jourden over the jail staff's failure to give him skin medication and blocked Jourden from closing the door to a secure hallway. After warning Young, Jourden discharged pepper spray in Young's face to get him out of the doorway. Inaudible video shows

Young walking around the pod wiping his face in response. Leaving the other pod unattended, Jourden and Clark next entered Young's pod to detain him for violating jail rules and to take him for medical treatment. Within a minute, Jourden (allegedly) pepper sprayed Young again and Clark (undisputedly) tased him. Jourden and Clark testified that they repeatedly told Young to get on the ground, but he failed to comply. Video also unambiguously shows Jourden pointing at the ground. Young, however, claims that the deputies did not say anything. For purposes of this appeal, then, I agree that we must assume that the officers did not warn Young about the use of force (no matter how unlikely that claim is). Still, Young must identify a case that has found "sufficiently similar" actions unconstitutionally excessive to hold Jourden and Clark liable in this fact-intensive area. *Id.* at 9. For two reasons, my colleagues identify no such case.

*Reason One: This case involves the use of force at a jail.* My colleagues rely primarily on precedent holding that officers used excessive force when they tased, hit, or pepper sprayed non-resisting or incapacitated individuals during an arrest. *See Eldridge v. City of Warren*, 533 F. App'x 529, 532–35 (6th Cir. 2013); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 686–88 (6th Cir. 2006); *Adams v. Metiva*, 31 F.3d 375, 386–87 (6th Cir. 1994). Yet Young's case involves the use of force to maintain security at a jail, not to effectuate an arrest in the outside world. That distinction is material, *Rivas-Villegas*, 142 S. Ct. at 8, so the cited precedent does not "squarely govern[]" this case's specific facts, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)).

In addition, none of our other cases has held that the excessive-force rules applicable to officers who are arresting a suspect apply in the same way to officers who are maintaining jail security. To the contrary, we have held that these "arrest" cases do *not* clearly establish the legal rules for other contexts. *See Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 286–88 (6th

Cir. 2020). In *Abdur-Rahim*, protesters refused to stop blocking an intersection, which led officers to discharge pepper spray over their heads to get them out of the street. *See id.* at 285. The plaintiff claimed that she was slowly leaving the intersection when the defendant officer walked up behind her and discharged pepper spray directly into her face. *See id.* The district court held that this second use of pepper spray violated our caselaw barring the police from using force on non-resisting and partially incapacitated individuals. *Id.* at 287. We disagreed, noting that the cited caselaw addressed officers who used force to make arrests. *Id.* We added that our "arrest" precedent did not provide clear guidance on the legal rules that should govern the case's different facts—the use of "pepper spray to disperse a crowd." *Id.* If this precedent does not clearly establish the legal rules that govern the use of force to disperse a crowd, I fail to see how it can clearly establish the legal rules that govern the use of force to maintain security at a jail.

So what are the legal rules for that jail context? Before 2015, our cases would have clearly established, if anything, the *propriety* of Jourden's and Clark's use of force. We traditionally treated a pretrial detainee's excessive-force claim under the Fourteenth Amendment's substantive-due-process protections as analogous to a convicted prisoner's excessive-force claim under the Eighth Amendment's ban on cruel and unusual punishments. *See Shreve v. Franklin County*, 743 F.3d 126, 134 (6th Cir. 2014). To show that force was excessive, therefore, a pretrial detainee needed to meet a demanding subjective test and prove that an officer used force maliciously to cause harm. *See id.* Under this test, we had held that officers may use "stun guns" or "chemical agents" on "recalcitrant prisoners" merely for disobeying orders. *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992); *see Sams v. Quinn*, 2017 WL 4574497, at *2 (6th Cir. Sept. 7, 2017) (order) (collecting cases). We, for example, found no constitutional problem when officers pepper sprayed inmates who refused to remove their shoes or get out of the shower. *See Jennings v.*

*Peiffer*, 110 F. App'x 643, 644–46 (6th Cir. 2004) (order); *Jennings v. Mitchell*, 93 F. App'x 723, 724–25 (6th Cir. 2004) (order). If this precedent remained the law, this case would be easy. Young identifies no evidence suggesting that Jourden and Clark used force "maliciously and sadistically" to harm Young without any security-related purpose. *Sams*, 2017 WL 4574497, at *2.

Since 2015, however, the law has been in a state of flux. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–400 (2015). In *Kingsley*, the Supreme Court held that the Fourth Amendment's objective-reasonableness test (not the Eighth Amendment's subjective-maliciousness test) applies to the use of force on pretrial detainees (as opposed to convicted prisoners). *See id.* Critically, however, the Court left no doubt that the objective-reasonableness test in this jail context comes with different rules than the objective-reasonableness test outside a jail. *See id.* at 397–400. The Court recognized that "[r]unning a prison is an inordinately difficult undertaking[.]" *Id.* at 399 (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). So it held that courts must "acknowledg[e] as part of the objective reasonableness analysis" the deference due "to policies and practices needed to maintain order and institutional security" at a jail. *Id.* at 399–400.

A reasonable officer thus could find that this institutional environment affects the force objectively justified when an inmate makes a jail disturbance—whether that inmate is a convicted prisoner or a pretrial detainee. *See Cretacci v. Call*, 988 F.3d 860, 869–70 (6th Cir. 2021); *Ayala-Rosales v. Teal*, 659 F. App'x 316, 321–22 (6th Cir. 2016). In this case, for instance, Deputies Jourden and Clark were the only two deputies locked in a pod full of inmates on a floor with a "problematic" reputation. Clark Decl., R.67-6, PageID 476. Video showed at least two other inmates wandering around the pod while the events unfolded, and the deputies knew that it might take several minutes for backup to arrive and that the other pod was unattended. Some of the pepper spray that Jourden originally used on Young had also gotten into Jourden's own eyes, and

it was increasingly incapacitating him by the time that Clark tased Young. All told, the deputies could reasonably think that time was of the essence to contain the situation. And no case of ours clearly established that their split-second decision to deploy pepper spray and a taser on an inmate who had caused a disturbance in a jail was unreasonable under the circumstances. *See Ayala-Rosales*, 659 F. App'x at 321–22.

My colleagues cite only one jail-specific case holding that an officer used excessive force: *Guy v. Metropolitan Government of Nashville & Davidson County*, 687 F. App'x 471 (6th Cir. 2017). In that case, Amy Guy asked the defendant, Officer Janie Romines, if she could see a nurse. *Id.* at 473. Romines responded by ordering Guy to her cell. *Id.* When Guy remained, Romines placed a hand on her shoulder and nudged her to her cell. *Id.* Guy took a few steps in that direction but then turned toward Romines, who immediately pepper sprayed her. *Id.* The events occurred before *Kingsley*, so we held that this pepper spray violated our clearly established caselaw under the Eighth Amendment's more demanding subjective-maliciousness test. *Id.* at 476. Among other evidence of Romines's bad intent, she had been disciplined for telling students that she "would use a chemical spray on any inmate who did not do what she said." *Id.* at 475.

*Guy* does not rebut Jourden's and Clark's qualified-immunity defense. To begin with, I question whether we can rely on this unpublished decision *at all* to show that the law clearly prohibited the deputies' conduct. Other circuit courts have noted that "[u]npublished cases . . . do not serve as binding precedent and cannot be relied upon to define clearly established law." *Crocker v. Beatty*, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021) (citation omitted); *see also, e.g.*, *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018); *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc); *cf. Shreve*, 743 F.3d at 136. That is because another panel of our court could simply refuse to follow *Guy* at a later date in a published decision. *Cf. Keahey v. Marquis*,

978 F.3d 474, 480 (6th Cir. 2020); *Hill v. Masters*, 836 F.3d 591, 596 n.4 (6th Cir. 2016). How can *Guy* "clearly establish" anything for officers if it does not clearly establish anything for us? *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). (Unpublished caselaw that rejects a constitutional claim, by comparison, might show that the law was ambiguous and so *not* clearly established. *See Grissom*, 902 F.3d at 1168.)

Regardless, "[t]he situation in [*Guy*] and the situation at issue here diverge in several respects." *Rivas-Villegas*, 142 S. Ct. at 8. Guy had not engaged in any prison infractions and so did not need to be taken into custody; Young had engaged in some six infractions and needed to be detained (and medically assisted). Guy had not been verbally combative with Romines; Young had loudly argued with Jourden. *Cf. Cretacci*, 988 F.3d at 869–70. No evidence suggested that Guy had a prior history of physical altercations with the police; Jourden knew that Young had physically resisted arrest months before. *Cf. Rivas-Villegas*, 142 S. Ct. at 8. These factual differences more than suffice to show that *Guy* does not "squarely govern[] the case here[.]" *Brosseau*, 543 U.S. at 201. And without a "sufficiently similar" case, Young cannot overcome the deputies' qualified-immunity defense. *Rivas-Villegas*, 142 S. Ct. at 9.

*Reason Two: Even if the events occurred outside a jail, our cases do not clearly establish that the deputies used excessive force*. My colleagues suggest that our caselaw in the "arrest" context clearly established the excessiveness of Jourden's use of pepper spray and Clark's use of a taser. Yet I find our caselaw in this context unclear on the dividing line between when officers may use pepper spray or a taser and when they may not. And the deputies' actions in this case fell within this "hazy border" that our precedent creates. *Brousseau*, 543 U.S. at 201 (citation omitted). That fact also confirms that we should grant the deputies qualified immunity. *See id.*

Our pepper-spray caselaw distinguishes between the use of pepper spray on individuals who do not voluntarily go into custody from the use of pepper spray on those who do. On the one hand, we have upheld the use of pepper spray on arrestees whom officers could conclude were not cooperating or might pose a threat. *See Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007). In one case, for example, we found the use of mace permissible even though the arrestee claimed that he had stopped protesting the arrest, put his hands up, and started walking toward the door to go with the officers to the station. *Lindsay v. Bogle*, 92 F. App'x 165, 167, 170 (6th Cir. 2004); *see also Henry v. City of Flint*, 814 F. App'x 973, 983 (6th Cir. 2020); *Williams v. Sandel*, 433 F. App'x 353, 361–63 (6th Cir. 2011); *Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008); *Monday v. Oullette*, 118 F.3d 1099, 1104–05 (6th Cir. 1997). On the other hand, we have found the use of pepper spray excessive when an officer had fully subdued an arrestee or when the arrestee had unambiguously surrendered. In a case on this side of the line, for example, we held that an officer had unreasonably pepper sprayed a man after he had submitted to the officer's authority by placing his hands against a wall. *Grawey v. Drury*, 567 F.3d 302, 306–07, 314 (6th Cir. 2009); *see also Wright v. City of Euclid*, 962 F.3d 852, 871–72 (6th Cir. 2020); *Ayala v. Hogsten*, 786 F. App'x 590, 592 (6th Cir. 2019); *Saunders v. Cuyahoga Metro. Hous. Auth.*, 769 F. App'x 214, 221–22 (6th Cir. 2019); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902–03 (6th Cir. 2004); *Adams*, 31 F.3d at 387.

Our cases on the use of a taser fit the same mold. There, we have held that officers generally may tase arrestees who actively resist but may not tase arrestees who passively resist or who do not resist at all. *See, e.g.*, *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017); *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). What qualifies as "active" resistance? It obviously reaches arrestees who physically struggle with police. *See Hagans v.*

*Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012); *Williams*, 433 F. App'x at 362.

Yet we have defined the word to cover conduct that is not all that "active." It covers, for example, a suspect's inactive refusal to move his hands to allow officers to handcuff him when coupled with verbal hostility. *Caie v. West Bloomfield Township,* 485 F. App'x 92, 94, 96–97 (6th Cir. 2012). How about "passive" resistance? It includes mere noncompliance with an officer's order without evidence of "volitional and conscious defiance" of that order (whether verbal or physical). *Eldridge*, 533 F. App'x at 534; *see also Goodwin v. City of Painesville*, 781 F.3d 314, 323–24 (6th Cir. 2015). Officers also, of course, may not tase individuals who have offered no resistance throughout the encounter or who have been incapacitated by the time of the tasing. *See Kijowski v. City of Niles*, 372 F. App'x 595, 598–600 (6th Cir. 2010); *see also Kent v. Oakland County*, 810 F.3d 384, 393–95 (6th Cir. 2016); *Landis v. Baker*, 297 F. App'x 453, 463–64 (6th Cir. 2008).

I do not think that these cases establish a clear line dividing the permissible use of pepper spray or a taser from the impermissible use of that force. And we have granted qualified immunity when an officer's force fell within the unclear border between the two. Consider *Thomas*. There, an officer walked toward a person suspected of fighting and ordered him to the ground. 715 F. App'x at 459. When the person walked away, the office fired his taser without warning. *Id.* We granted the officer qualified immunity, reasoning that he could have viewed the mere walking away as "active" resistance. *Id.* at 461. Or consider *Cockrell v. City of Cincinnati*, 468 F. App'x 491 (6th Cir. 2012). There, a jaywalker ran from an approaching officer and the officer discharged his taser for this minor misdemeanor. *See id.* at 492. We again granted qualified immunity to the officer, reasoning that running was a form of active resistance. *See id.* at 495–97.

Young's claims against Deputies Jourden and Clark fall within the same gray area. Even outside this case's jail setting, it is not clear whether our caselaw would treat Jourden's use of

pepper spray and Clark's use of a taser as excessive. After the first pepper spray, Jourden and Clark had probable cause to detain Young (what is analogous to an arrest in the outside world). Young had committed several jailhouse infractions and needed medical attention for the spray in his eyes. Indeed, if the deputies had simply let Young wander around the pod, he may well have claimed that they violated the Constitution by not ameliorating the spray's effects. *Cf. Patel v. Lanier County*, 969 F.3d 1173, 1186–87 (11th Cir. 2020). Jourden also knew that Young had been physically combative when officers attempted to arrest him. And both deputies knew that Young had just been verbally combative in the doorway, loudly arguing with Jourden over medication.

On these facts, reasonable officers could believe that the Constitution permitted the deputies' conduct. "Even if the scenario played out as innocently as [Young] claims," the deputies could conclude that they need not wait "until it became clear where [Young] was going or what he was doing before" using force to control the situation. *Lindsay*, 92 F. App'x at 170. As in *Lindsay*, Young's intentions were at least ambiguous. *See id.* And while Young was no longer "verbally" "combative," the deputies could also believe that the use of pepper spray or a taser were superior options to physically grabbing Young to take him into custody. *Monday*, 118 F.3d at 1104.

My colleagues respond that a reasonable jury could find that Young had been "subdued" after the first pepper spray. Yet the video shows him plainly walking around the pod. Like the suspect in *Thomas*, Young was also walking *away* from the deputies. 715 F. App'x at 461. He thus objectively evinced at least "some outward manifestation . . . suggest[ing] volitional and conscious defiance" of them. *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020) (citation omitted). And while I agree that we must assume at this stage that the officers did not give Young a verbal warning, there was likewise "no indication" in *Cockrell* that the officer

"ordered [the jaywalker] to halt" before tasing him. 468 F. App'x at 492. Are the deputies' actions here really more excessive than the unwarned tasing of a fleeing jaywalker?

\* \* \*

In retrospect, perhaps Deputies Jourden and Clark could have casually walked up to Young, handcuffed him, and led him out of the pod without incident. But that sort of after-the-fact speculation engages in the type of hindsight bias that judges must avoid when identifying the safety risks that the Constitution imposes on officers who confront dangerous situations. *See Shanaberg v. Licking County*, 936 F.3d 453, 457 (6th Cir. 2019). Our cases also illustrate the harms that suspects can suffer (such as a broken leg or a skull fracture) when a struggle ensues after officers try to take them into custody by physically grabbing them. *See, e.g.*, *Griffin v. Hardrick*, 604 F.3d 949, 951 (6th Cir. 2010); *Ayala-Rosales*, 659 F. App'x at 317. And the Supreme Court has made clear that we should not dismiss the deputies' judgment on the actions required to "maintain order and institutional security." *Kingsley*, 576 U.S. at 400. While any reasonable officer would know that a gratuitous pepper spraying or tasing of a subdued detainee would violate clearly established law, those are not this case's facts. For these reasons, I would reverse the district court's denial of qualified immunity. Because my colleagues see things differently, I respectfully dissent.